HOOD, Judge
(dissenting).
I think a rehearing should be granted in this case.
The evidence, in my opinion, establishes that Mr. Havens did not commit adultery at any of the times alleged or at any time material to this suit. It is true that he and Mrs. Northcutt had engaged in sexual relations about one year prior thereto, but that was known to Mrs. Havens, and it is undisputed that she had condoned this prior act.
The issue presented, insofar as plaintiff’s demand for a divorce is concerned, is whether Mr. Havens committed adultery with Mrs. Northcutt on November 8, 9, 10, 11 or 12, 1968. The trial judge did not permit either party to introduce evidence as to acts of adultery committed at any other time, since no other acts were specifically alleged. If the judgment rendered by the majority here is to stand, therefore, it must be based on a finding that adultery was committed by the defendant only on one of those dates. If the majority bases its judgment on a finding that adultery was committed at any other time, then they erred in doing so or in failing to remand the case, because the defendant has not had an opportunity to defend against assertions that he committed such acts on any other day.
In reversing the trial judge and decreeing a divorce between these parties, my colleagues have relied solely on statements made by “the son of Mrs. Northcutt” and on the testimony of four other witnesses. In accepting the testimony of these witnesses, and in interpreting their statements as supporting plaintiff’s allegations, the majority has ignored the factual findings made by the trial judge, and they have rejected the testimony of several other witnesses, including that of another son of Mrs. Northcutt, that of the Sheriff of Beauregard Parish, and the admissions made by Mrs. Havens herself. I believe that the record fully supports the trial judge, and that my brothers who are in the majority have erred in failing to consider his evaluation of the credibility of the witnesses.
Mr. and Mrs. Northcutt had four children, the two older ones being boys, one named Clarence and the other named Eddie. The parents separated sometime in 1967, and Mr. Northcutt moved to Oklahoma with his son, Clarence, who was then in the seventh or eighth grade. He lived with this child in Oklahoma for about a year, until on or about November 8, 1968, when he returned to Louisiana. A few days later, on November 13, Mr. Northcutt was shot and killed by Mr. Havens. This suit for divorce was filed five days after this shooting occurred, and it came up for trial in June, 1969. Before the case was tried, Clarence moved out of his mother’s home and he has not lived with his family since that time.
The evidence shows that Mr. Northcutt and Mrs. Havens slept in the same house, with no one else present, beginning on the morning of November 9, shortly after he returned to Louisiana, and on at least one or two nights thereafter. While they were living together, he and Mrs. Havens entered into ■ a conspiracy to kill the defendant, Mr. Havens. With that plan in mind, *382 Mr. Northcutt obtained Havens’ own rifle to use in committing the act. Some friends and neighbors, including Mrs. Northcutt’s son, Eddie, warned Havens of this plot, and the result was that Northcutt, instead of Havens, was killed.
Both of the Northcutt boys were present on an occasion when their father and Mrs. Havens were discussing their conspiracy to kill Mr. Havens. They were with Mr. Northcutt and Mrs. Havens when the latter went to Havens’ home and took his rifle to use in carrying out their plan. The record does not show the details of how Northcutt happened to get shot and killed, except that it does show that the incident occurred at the Havens’ home. Criminal charges were filed against Havens as a result of this shooting, but he was acquitted when the case came up for trial in May, 1969.
With this background, it is understandable that both of the Northcutt boys were emotionally upset following the sudden death of their father. Clarence Northcutt must have been particularly upset since he had been living with his father for the past year. Both boys unquestionably were antagonistic toward Mr. Havens and perhaps toward their own mother. The trial judge was in a better position to evaluate the credibility of these two children than is the majority of this court, arid yet my brothers have completely ignored the views of the trial judge. They have interpreted one child’s testimony, erroneously I think, as being that Mr. Havens committed adultery on the morning of November 13 (that being the same morning on which Mr. Northcutt was killed), and they have accepted that statement as supporting plaintiff’s allegations, rejecting the unim-peached testimony of a number of other witnesses to the contrary.
The majority opinion recites that “the son of Mrs. Northcutt did testify that Mr. Havens, the defendant, had slept in his mother’s bed the morning of November 13, 1968.” Both of Mrs. Northcutt’s sons testified at the trial. One of them, Eddie, stated that Mr. Havens did not even arrive at the Northcutt home until the children were getting up for school that morning, and that Havens did not sleep there at all. His testimony to that effect is supported by that of a number of other disinterested witnesses.
Clarence Northcutt was the only other son of Mrs. Northcutt, who testified, so it obviously was his testimony on which the majority relied on reaching its conclusion that adultery had been committed on the morning of November 13. In spite of the prejudice of this boy toward defendant Havens, I cannot find that he ever testified that Mr. Havens occupied a bed in the Northcutt hbme on the morning of November 13, all as found by the majority. The part of his testimony which was admitted in evidence, interpreted most favorably to plaintiff, is that he saw Mr. Havens at the Northcutt home sometime after 6:00 A.M. on November 13, several minutes after the boy had gotten up to go to school, that he believes Havens spent the night there, but that he doesn’t “remember exactly.”
It is true that Clarence testified at one point that Havens had slept in his mother’s bed, but he was referring to a time long before the dates alleged in the petition. He obviously was referring to the incident which had occurred a year prior thereto, which incident was readily admitted by Havens and which had been condoned by plaintiff. The trial court, however, specifically excluded that part of the boy’s testimony, and that statement appeared in the record only as a proffer of proof, under the heading of “excluded testimony.” It cannot serve as the basis for a judgment, even if considered by my colleagues, since the defendant has had no chance to rebut it. Also, with reference to this excluded testimony of young Clarence, the record shows that the boy made previous inconsistent statements. He admitted, for instance, that shortly before the trial he stated to an attorney and to an investigating officer that he had never seen Mr. Havens sharing or occupying a room with his *383 mother, or having immoral relations with her. He stated that he had never seen Mr. Havens occupying a bed in the Northcutt home at any time, nor had he ever seen him staying in that home at night.
The statements of the three Cooley brothers and of Mr. C. E. Simmons, also relied on by the majority, do not support plaintiff’s allegations. The three Cooleys who testified are relatives of Mr. North-cutt, the latter being their nephew. One of them testified that they were “pretty close” to Northcutt and often drank with him. And, as an indication of their closeness to the decedent, one of these witnesses loaned Northcutt an automobile for him to use while he was in Beauregard Parish. It is obvious from the record itself that these three Cooley brothers were extremely hostile toward Mr. Havens, probably because he had shot their nephew. But, even so, their testimony does not show that Havens committed adultery, as alleged.
The majority has quoted only that part of the testimony of each of these four witnesses which was the most damaging to defendant. As is shown by these quoted excerpts, Woodrow Cooley assumed that Mr. Havens had spent the night of November 12 in the Northcutt home, because he saw Havens leave that home just after the school bus picked up the children the next morning. What the majority overlooks, however, is that the evidence shows clearly that Havens arrived at the Northcutt home only a few minutes before Cooley saw him leave, and that all four children and Mr. Northcutt were there .during the entire time Havens was in the house. Also, Woodrow Cooley acknowledges that he saw Mr. and Mrs. Northcutt leave the house at about the same time Havens left it, and that he saw the four Northcutt children leave the house and board the school bus just a few minutes before all of these parties left the house. The testimony of Woodrow Cooley, in my opinion, just cannot be interpreted as showing that Mr. Havens committed adultery with Mrs. North-cutt at any time.
The majority opinion quotes Walden Cooley as testifying that Havens “stayed there for six months or longer,” and my colleagues then assume from that statement that the witness meant that Havens had spent the nights of November 11, 12 and 13 at the Northcutt home. Walden Cooley made the above quoted statement, but the trial judge immediately ordered that it be stricken from the record, and he refused to permit any further evidence as to that issue, thus preventing defendant Havens from disputing it. But, even if the majority should consider this excluded evidence, Walden Cooley did not say that Havens was at the Northcutt home on the dates assumed by the majority. On the contrary, he stated that the only time he saw Havens from November 8 to November 13, was about 7:30 A.M., on November 13, when Mr. Northcutt, Mrs. Northcutt and Havens all left the house in sepárate cars just as the school bus pulled away. I can find nothing in his testimony which can be interpreted as showing that Havens committed adultery with Mrs. Northcutt at any of the times alleged here.
Homer Cooley (erroneously referred to as Herman Cooley in the majority’s opinion) stated that he did not see Mr. Havens at the Northcutt home at any time. His testimony was simply that after daylight on the morning of November 13, he saw Havens’ car parked in front of the house, as this witness picked up the Northcutt children in his school bus. He said that at the same time he saw Mr. Northcutt sitting in a pickup truck which was parked in front of the house.
C. E. Simmons, the remaining witness, on whom my colleagues rely, stated that the only time he saw Havens during the period in question here was at about 7:00 or 7:30 A.M. on the morning of November 13, when Mr. and Mrs. Northcutt and Mr. Havens all left the residence building shortly after the school bus had pulled out. The portion of his testimony which is quoted in the majority opinion was excluded by the trial judge, and again I call at *384 tention to the fact that defendant has never had an opportunity to defend himself against the assertion that acts of adultery were commited at times other than between November 8 and November 13.
The above is the evidence on which the majority has relied in reversing the trial court. The trial judge either interpreted the statements of these witnesses differently than did the majority or he rejected their testimony. I feel that their testimony, taken at its face value, cannot logically be interpreted as showing that the alleged acts of adultery were committed. As stated by the trial judge, this evidence, at most, shows only that these witnesses, all of whom were highly prejudiced against Havens, merely surmised or suspected that adultery had been committed on the dates alleged. I do not believe that Havens should be condemned on that kind of evidence. The judgment rendered by the trial judge was based on the positive, straightforward testimony of several other witnesses, none of whom had any reason to favor one party or the other, and I think that evidence establishes that adultery could not have been committed by Mr. Havens and Mrs. Nortcutt on any of the dates alleged.
According to Mrs. Havens’ own testimony, her husband spent the entire day and evening with her on November 8, 1968, and they both slept in their home that night. Mr. Havens was employed to work at Fort Polk, his working schedule being 24 hours on duty, and 24 hours off. He got up early on the morning of November 9 to go to work. The evidence shows conclusively that he spent the nights of November 9 and November 11 at work at this military installation. It also shows that Havens spent the nights of November 10 and 12 at the home of his sister-in-law, Mrs. J. N. Havens, that being also the home of the latter’s married daughter. He left that home on the morning of November 11, just in time to report to his job at Fort Polk. On the morning of November 13, he got up relatively early, and ate breakfast at the J. N. Havens home. He then left shortly after daybreak, in his car, and drove to the Northcutt home. He parked his car in front of the house, and went inside where he waited for 30 or 40 minutes until the school bus had picked up the Northcutt children and had left. He left the house immediately after the school bus drove away.
Mr. Havens explained that he stopped at the Northcutt home that morning to see if the family needed any assistance. The circumstances were that Mr. Northcutt had been back in that vicinity for a few days, he had been drinking, and he had made threats against his wife, as well as against Mr. Havens. As Havens was driving by the Northcutt home that morning, he saw Northcutt sitting in a pickup truck in front of Mrs. Northcutt’s home. Northcutt was asleep in the truck at that time, but Havens had been warned by that time of Northcutt’s threats, and he feared for the safety of the other members of the family. The children were being prepared for school when Havens arrived at the North-cutt home, and Havens left the house immediately after the children were put on the bus.
No one has questioned any of the above mentioned facts. The majority has not specified any particular date on which Havens committed adultery, because the evidence shows none.
I realize that this discussion of facts is far too lengthy, but I felt that it was necessary to review the facts somewhat in detail to show: (1) That the majority could not have based its decree on a finding that adultery was committed at any of the times alleged; and (2) That the judgment rendered here obviously is based on excluded testimony to the effect that Mr. Havens had visited the Northcutt home at indefinite and unspecified times prior to November 8, 1968. I believe that my colleagues have erred in rendering such a decree, since defendant has never had a chance to defend against such claims, and the record *385 thus does not show what the true facts may have been prior to to the last mentioned date.
But, even if the evidence could be construed as showing adultery on the part of Mr. Havens, plaintiff still is not entitled to obtain a judgment of divorce against him. The evidence, including admissions by plaintiff herself, establishes that Mrs. Havens, the plaintiff, committed adultery on several occasions at about the same time she alleges that defendant did so, and that she again committed adultery over a period of three days shortly before the case was tried.
The law is settled that a divorce will not granted in favor of one party where both parties are equally at fault. Karl v. Karl, 191 So.2d 674 (La.App. 2 Cir.1966).
Mrs. Havens admits, and the evidence shows, that Mr. Northcutt contacted her by telephone late in the afternoon of November 8, shortly after he arrived back in Louisiana. As I have already noted, Mrs. Havens spent the night with her husband in her home on November 8, and Mr. Havens got up early the next morning to go to work at Fort Polk. Within one hour after Mr. Havens left the house that morning, and while it was still dark, Mr. North-cutt went to Mrs. Havens’ home, and he spent from one to three nights with her, in that home, between November 9 and the time of his death on November 13. Mrs. Havens explained that Northcutt came to her house immediately after her husband left on November 9 merely to convince her that Mr. Havens was unfaithful to her, and that she allowed him to sleep there, with no one else but her in the house, because “I wouldn’t have put a dog out because it was freezing, and it was for an hour or two.” She admitted to Sheriff Stark, of Beauregard Parish, that North-cutt stayed in her house “a night or two” or “two or three nights”, and that “he slept in Andy’s (Mr. Havens’) bed.”
While Northcutt was staying with Mrs. Havens during that period of two or three days, he assisted her in engaging a lawyer to obtain a' divorce for her against her husband. He conspired with her to kill Havens, and he appropriated Havens’ pickup truck and his rifle and bullets to use in accomplishing that task.
The evidence also shows that Mrs. Havens lived with a man named Garthel “Shorty” Bailey for three days and nights, on May 30 and 31, and on June 1, 1969. Mrs. Havens’ only explanation of this was that “he was going to hire me to work for his sister”, and “I cooked supper.” She also justified her stay there by stating that another man, whom she referred to as “Bryan”, also stayed in the house. The evidence shows that there were only two bedrooms in that four-room residence building.
Under these facts, I am at a complete loss to understand how my colleagues can reverse the trial judge and render a judgment of divorce against Mr. Havens. Although some factual issues are presented, I think the following important legal questions also must be considered: (1) Did the majority err in basing its judgment on evidence which had been excluded by the trial court? (2) Since the majority has concluded that the judgment of the trial court must be reversed on grounds which were not alleged, and on evidence which was excluded by the trial court, should not the case have been remanded to allow the defendant an opportunity to rebut the evidence on which this court’s judgment is based? (3) Did the majority err in failing to consider the trial court’s evaluation of the credibility of the witnesses? (4) Did they err in applying the circumstantial evidence rule, even though the evidence failed to exclude every reasonable hypothesis other than that of guilt? (5) Is plaintiff entitled to a judgment of divorce against her husband when she is at least equally at fault (the evidence, in fact, establishes that she is at fault and that he is not) ? (6) In view of the serious effect which a judgment of divorce, based on adultery, usually has on the parties and *386 upon the children of those involved, should not courts require strong and substantial proof of the acts of adultery before decreeing a divorce ?
I feel that my conscientious colleagues, although sincere in their convictions, have erred in their factual findings and in their application of the established law, and that the judgment rendered by them should not be allowed to stand.
For these reasons, I respectfully dissent from their refusal to grant a rehearing.